cal_____

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARAMONDO SAMUEL CORDOVA,    )<br>                                                        )<br>           Petitioner,                        )<br>v.                                                      )<br>                                                        )<br>DOMINGO URIBE, JR., Warden,  )<br>                                                        )<br>           Respondent.                    )<br>_____ ) | Civil No.10cv799 LAB(AJB)<br><br>**REPORT AND RECOMMENDATION DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

On April 13, 2010, Petitioner, Aramondo Samuel Cordova, a state prisoner proceeding *pro se* and *in forma pauperis,* filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. On June 15, 2010, Respondent filed an Answer and on November 10, 2010, Petitioner filed a Traverse After a thorough review, this Court finds that Petitioner is not entitled to the relief requested and **RECOMMENDS** that the Petition for Writ of Habeas Corpus be **DENIED** and **DISMISSED** for the reasons outlined below.

**Procedural Background**

**A.    Conviction and Sentence**

On March 14, 2007, a jury convicted Petitioner of two counts of second degree murder in violation of California Penal Code section 187(a), one count of attempted murder in violation of California Penal Code sections 664, 187(a); one count of attempted voluntary manslaughter in violation of California Penal Code sections 664, 192(a); and two counts of assault with a firearm in violation of

California Penal Code section 245(a)(2). (Notice of Lodgment ("Lodgment") 2 at 461.) On July 11, 2007, the trial court sentenced Petitioner to 107 years to life plus ten years in state prison. (Id. at 463-64.)

**B.   Direct Appeal**

Petitioner, through appointed appellate counsel, filed a timely direct appeal with the California Court of Appeal, Fourth Appellate District, Division One. (Lodgment 3.) On November 3, 2008, the Court of Appeal affirmed the conviction. (Lodgment 6.) On December 8, 2008, Petitioner filed a petition for review in the California Supreme Court. (Lodgment 7.) On January 14, 2009, the California Supreme Court denied the petition for review without comment. (Lodgment 8.)

**C.   Instant Federal Petition for Writ of Habeas Corpus**

Petitioner filed the instant federal Petition on April 13, 2010 challenging his conviction and sentence. On June 15, 2010, Respondent filed an Answer and on November 10, 2010, Petitioner filed a Traverse.

**Factual Background**

The following factual background is taken from the Court of Appeal opinion in People v. Cordova, unpublished opinion (Cal. Ct. App., 4th Dist., Div. 1, November 3, 2008). The Court presumes these factual determinations are correct pursuant to 28 U.S.C. § 2254(e)(1).

A. Prosecution Evidence

> In May 2004, Cordova was living in Chula Vista with two of his friends, Kris Ebbert and Aliso Moriarty. On May 29, 2004, they held a party in honor of Ebbert's birthday.
>
> Cordova was consuming alcohol at the party. He appeared increasingly agitated and belligerent as the night progressed. For example, he was angered when a woman to whom he was attracted ignored him and, when he saw her talking to an African-American man, Cordova uttered, "fucking nigger." In another instance, Jenna Carlson was talking to another partygoer when Cordova approached from behind and kicked Carlson in the buttocks, and when she demanded to know why, Cordova replied, "Because I had to." Cordova was also angered when Ebbert broke Cordova's marijuana pipe, and Cordova told Ebbert he would make Ebbert pay for the damaged pipe. Around 2:00 a.m., when Cordova and Jessica McIntire went to a store to purchase more beer for the party, Cordova was "kind of a jerk to the clerk" at the store.
>
> Toward the end of the night, Cordova appeared "pretty drunk" and was acting "aggravated" and "stupid and loud." He began breaking things and punching walls while cursing, and appeared "real angry." At one point, while sitting in a chair, Cordova "flipped out," yelled something, and hit the bottom part of a

window with his hand, shattering the bottom portion of the glass. When McIntire asked if he was all right, Cordova stated, "This is my fucking house and I can do what the fuck I want." A moment later, a friend (Adam Paxton) entered the room and threw a glass or beer bottle above Cordova's head, shattering the remaining part of the glass window Cordova had just broken. Cordova was very upset and confronted Paxton, and stated Paxton owed him money for the window. Paxton replied that it "was already broken so I really don't owe you anything." Cordova began ripping the curtains from the windows, and Paxton left the room. Shortly thereafter, Ebbert walked into the room and Cordova (for no apparent reason) told him to "fuck off." Ebbert told Cordova that, if he had a problem with Ebbert, they could "go handle this outside." However, that confrontation cooled off, and Cordova and Ebbert went to their respective bedrooms.

Most of the guests left after the window-breaking incident, but several remained. Moriarty and Paxton were outside on the porch, and Ebbert was in the front yard talking to his cousin (Mel Ordonez), when Moriarty saw Cordova in the dining area. Cordova was standing approximately 20 feet from Moriarty and was holding a silver revolver and pointing it at Moriarty. Moriarty told Paxton they should leave and, when Ebbert and Ordonez started to go toward the house, Moriarty warned them that Cordova was inside with a gun and there was a problem. Ebbert replied he was not afraid of Cordova. Ebbert and Ordonez then went inside and went into Ebbert's bedroom.

Moriarty then heard Cordova and Ebbert talking in the living room and overheard Cordova say "hold it" and then say, in an angry tone, that Ebbert had made Cordova "feel like a coward in [my] own house." Ebbert then stated, "It looks like you are not playing around anymore. What are you going to do with that thing?" and then Moriarty heard a shot fired. Cordova had switched weapons and used a .12 gauge pump action shotgun, loaded with slug ammunition, to commit the offenses.

Moriarty then saw Cordova, holding a shotgun, standing just inside the house near the open front door. Cordova said, "Hey Damian" and then shot Paxton in the chest.[1] Moriarty began running away, and when he turned to look back at Cordova, he saw Cordova raising the gun. Moriarty heard another shot being fired and felt something hit him in the back, but he was not struck by the shotgun slug. At some point one of the shots fired by Cordova also struck Mr. Ordonez.

After Moriarty found a hiding place, he looked back and saw Cordova reenter the house. He then saw Cordova reemerge, still holding the shotgun, and begin running in the opposite direction. Moriarty went back inside the house and found Ebbert on the living room floor with a chest wound. Moriarty and his girlfriend, who had been in the bathroom, then left and called police.

Chula Vista Police Officer Szymczak was on duty in the area when he heard four shots being fired. He immediately began running toward the sounds, and observed a person (later identified as Damian Resendez) running toward him. Szymczak ordered Resendez to the ground, and Resendez complied. A few seconds later, Szymczak saw another person also fleeing the scene, but that person (who was not apparently armed) did not comply with Szymczak's order to stop.

---

[1] Damian Resendez had attended the party and had been in an earlier confrontation with another partygoer over an alleged theft. Cordova had told Resendez at that time, "Stop acting like a bitch."

At the same time, Officer Uribe was driving near the area of the shootings. He saw two men, one of whom was carrying a two-foot-long black object, standing on the corner of 1st Avenue and I Street. When Uribe shone his spotlight on them, the man carrying the object fled and jumped over a fence. Uribe radioed police and a perimeter was set up to contain the suspect and find him.

Approximately 45 minutes later, Uribe heard sounds from the side of a residence near the corner of 1st and I, and another officer (Officer Padilla) yelled out "police." Padilla saw Cordova emerge from behind a fence and ordered him to stop but Cordova ran back through the gate. Officer Chavez, approaching the area from a different direction, saw Cordova jump over a fence, and ordered him to stop. Cordova eventually complied, and police arrested him. During his transport to the police station, Cordova was acting "obnoxious" and made weird statements, including telling Chavez she was "the hottest detective [he's] ever seen" but later calling her a "bitch" and a "whore." He also stated "one slug [was] all it took," and claimed he had a blueprint of the police station. A blood alcohol test taken from Cordova approximately five hours after the shootings showed he had a blood alcohol level of .16 percent.

The following morning, police searched the area around Cordova's arrest. They found a pump action .12 gauge shotgun with a pistol grip, and ballistics tests confirmed the shotgun matched the expended casings found at the site of the shootings.

Ebbert and Paxton died from shotgun wounds. Ordonez suffered "massive" soft tissue damage and other injuries.

B.      Defense Evidence

Several of Cordova's friends testified Cordova drank often and was a heavy drinker. Cordova was drinking heavily, and also ingested cocaine, the night of the party. He became increasingly intoxicated, was acting bizarre, and made numerous illogical statements.

Dr. Smith, a psychiatrist, estimated Cordova's blood alcohol level at the time of the shooting was around .24 percent. Dr. Smith testified that some people would be rendered unconscious with a blood alcohol level of .16 percent. He stated that even extreme alcoholics with a blood alcohol level of .24 would be severely impaired or confused and could suffer memory loss. Dr. Smith also stated Cordova suffered from paranoia, organic brain syndrome with learning disability, a psychotic disorder caused by alcohol, and posttraumatic stress disorder resulting from prior life events.[2] Dr. Smith believed, considering Cordova's prior mental deficiencies and extreme alcohol ingestion, Cordova's reported inability to recall the events of that night was consistent with his having acted in an alcoholic blackout.

Cordova testified he had suffered from alcohol blackouts in the past. He had been drinking heavily throughout the party, did not recall most of the events of the

---

[2] Dr. Saddick, a neuropsychologist who extensively tested Cordova, testified for the defense that Cordova had a mild organic brain dysfunction in his frontal lobe. A frontal lobe dysfunction can impair a person's ability to plan and reason, and can cause a person to act impulsively without proper judgment, and the dysfunction is exacerbated by chronic and heavy alcohol use.

4

party, and had no memory whatsoever of the shootings. He had no reason to kill his very good friends.

Cordova acknowledged he had several prior confrontations with people that involved alcohol. In one instance, he threw a beer bottle at a friend and, after they were separated, grabbed a kitchen knife and went after the friend, but others intervened and took the knife from him. In another incident, a friend (Galen Short) refused to leave Cordova's house and Cordova "came to him." They wrestled to the ground, and Cordova ultimately grabbed a knife and chased Short out of the house.[3] In another incident, Cordova climbed onto the roof of his house carrying a shotgun after receiving a telephone call from someone claiming they were coming to his house with a truckload of illegal immigrants.

C. Rebuttal

A prosecution neuropsychologist, Dr. Delis, testified Cordova showed no consistent evidence of frontal lobe dysfunction, and Cordova was exaggerating or amplifying his psychiatric symptoms. He also stated Cordova was not suffering from posttraumatic stress disorder.

(Lodgment 6.)

## Discussion

Petitioner raises one claim in his petition arguing that the trial court erroneously instructed the jury on a revised version of the defense of unconsciousness during jury deliberations.

**A.  Scope of Review**

28 U.S.C. § 2254(a) provides:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a). As amended, the AEDPA now reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application</u> of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

---

[3]Short testified that, after they wrestled, Cordova became upset, went upstairs to his room, returned with a shotgun and pointed it at Short. Short ran from the house. As Short was driving away, Cordova came outside wielding a knife.

To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2). See Williams v. Taylor, 529 U.S. 362, 403 (2000). The threshold question is whether the rule of law was clearly established at the time petitioner's state court conviction became final. Id. at 406. Clearly established federal law, as determined by the Supreme Court of the United States "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 71 (2003). However, Ninth Circuit case law may be "persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established.'" Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000). Only after the clearly established Federal law is identified can the court determine whether the state court's application of that law "resulted in a decision that was contrary to, or involved an unreasonable application of" that clearly established Federal law. See Lockyer, 538 U.S. at 71-72.

A state court decision is "contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams, 529 U.S. at 405-406. "A state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. Under Williams, an application of federal law is unreasonable only if it is "objectively unreasonable." Id. at 409. Further, a state court's decision results in a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding" if it "is so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997) (citations omitted).

In making such a determination under AEDPA, the court looks to the state's last reasoned decision. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. Ylst v.

Nunnemaker, 501 U.S. 797, 801-06 (1991). A state court need not cite Supreme Court precedent when resolving a habeas corpus claim. Early v. Packer, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" id., the state court decision will not be "contrary to" clearly established federal law.

**B.     Jury Instruction Error**

Petitioner argues that the trial court erroneously instructed the jury on the defense of unconsciousness during jury deliberations violating his due process rights under the Fourteenth Amendment. (Pet. at 6.) Specifically, he contends that the original given instruction of CALCRIM No. 3425 was correct while the modified version, given during jury deliberations, was an incorrect statement of the law and undermined his defense of unconsciousness due to voluntary intoxication. (Pet., Attach. A at 3-4.) Respondent argues that there was no jury instruction error.

In Cupp v. Naughten, the United States Supreme Court presented the standard for jury instruction error in habeas cases. Cupp v. Naughten, 414 U.S. 141, 147 (1973). The only question for a federal habeas court is whether, "under the circumstances as a whole and given the evidence in the case, the failure to give the requested instruction rendered the trial so fundamentally unfair as to violate federal due process." Duckett v. Godinez, 67 F.3d 734, 746 (1995) (citing Cupp, 414 U.S. at 147). A single jury instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp, 414 U.S. at 146-47. "An omission ... is less likely to be prejudicial than a misstatement of the law" and the petitioner bears an "especially heavy" burden. Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

In the instant case, the California Supreme Court denied Petitioner's petition for review in an order containing no reasoning for its decision. (Lodgment 8.) Therefore, this Court must look to the last reasoned state court decision and presume that the unexplained opinion rests upon the same ground. See Ylst, 501 U.S. at 803. The last reasoned state court decision was issued by the Court of Appeal on November 3, 2008. (Lodgment 6.)

In considering the entirety of the instructional charge to the jury and the closing arguments by both parties, the court of appeal concluded that the jury understood and properly applied the applicable law embodied in the instructions. (Id. at 13.) The new instruction distinguished unconsciousness

caused by organic brain dysfunction and/or Posttraumatic stress disorder from voluntary intoxication and clarified that involuntary unconsciousness was a defense to the crimes of murder and attempted murder while voluntary intoxication unconsciousness was not a defense to murder and attempted murder. (Id. at 14.) The trial court also coupled the modified instruction with CALCRIM No. 626 which discussed how unconsciousness caused by voluntary intoxication is a mitigating factor that would make Petitioner guilty of involuntary manslaughter. (Id.) In conclusion, the court of appeal held that the jury was adequately instructed. (Id. at 15.)

At the conclusion of closing arguments, on March 8, 2007, the trial court instructed the jury on the following: CALCRIM Nos. 625 (voluntary intoxication: effects on homicide crimes), 626 (voluntary intoxication causing unconsciousness: effects on homicide crimes), 627 (auditory hallucinations: effect on premeditation), 3425 (unconsciousness), 3426 (voluntary intoxication), 3428 (mental impairment; defense to specific intent or mental state). (Lodgment 2 at 246-48, 262-64; Lodgment 1, 13 RT at 1877-79; 1890-92.)

CALCRIM No. 3425 that was originally given to the jury stated:

> The defendant is not guilty of any murder or attempted murder if he acted while legally unconscious. Someone is legally unconscious when he or she is not conscious of his actions. Someone may be unconscious even though able to move.
>
> ***Unconsciousness may be caused by a blackout or a combination of factors, such as alcoholic blackout, alcoholic hallucinations, organic brain dysfunction, learning disabilities, post traumatic stress disorder, or any mental defect.***
>
> The People must prove beyond a reasonable doubt that the defendant was conscious when he acted. If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious, you should conclude that he was conscious. If, however, based on all the evidence, you have a reasonable doubt that he was conscious, you must find him not guilty.

(Lodgment 1, 13 RT at 1891) (emphasis added).

On March 9, 2007, the jury, while in deliberations, presented the court with a question, "Can a person in an alcoholic blackout [be] considered conscious or unconscious by law?" (Lodgment 2 at 281.) The court heard arguments from both parties and in response to the jurors question, the Court wrote to the jurors to "Please review the following instructions: 3425, 3426, 3428, 625, 626, and 627." (Id. at 282.)

1    On March 12, 2007, the People filed a motion to remove the previously given CALCRIM No.
2 3425 and arguments were heard. (Lodgment 1, 13 RT at 1930-1196.) After hearing oral argument on
3 the issue, the trial court withdrew the previously stated jury instruction CALCRIM No. 3425 and
4 provided a new version. The court explained that the new version distinguished all other forms of
5 blackout from alcoholic blackouts. (Id. at 1971-72.) In the new version, the court changed the language
6 in the second paragraph to: "[u]nconsciousness may be caused by a blackout (other than an alcoholic
7 blackout) or by a combination of organic brain dysfunction and post traumatic stress disorder." (Id. at
8 1997.)

   The trial court gave the following revised instruction on CALCRIM No. 3425:

   The defendant is not guilty of any murder or attempted murder if he acted while legally
   unconscious. Someone is legally unconscious when he or she is not conscious of his
   actions. Someone may be unconscious even though able to move.

   ***Unconsciousness may be caused by a blackout (other than an alcoholic blackout) or by
   a combination of organic brain dysfunction and post traumatic stress disorder.***

   The People must prove beyond a reasonable doubt that the defendant was conscious
   when he acted. If there is proof beyond a reasonable doubt that the defendant acted as if
   he were conscious, you should conclude that he was conscious. If, however, based on all
   the evidence, you have a reasonable doubt that he was conscious, you must find him not
   guilty.

(Lodgment 1 at 13 RT 1997) (emphasis added). The trial court also told the jury to consider the new
version of CALCRIM No. 3425 in conjunction with CALCRIM No. 626 and read:

   Voluntary intoxication may cause a person to be unconscious of his or her actions. A
   very intoxicated person may still be capable of physical movement but may not be aware
   of his or her actions or the nature of those actions. A person is voluntarily intoxicated if
   he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other
   substance knowing that it could produce an intoxicating effect or willingly assuming the
   risk of that effect. When a person voluntarily causes his or her own intoxication to the
   point of unconsciousness, the person assumes the risk that while unconscious, he or she
   will commit acts inherently dangerous to human life. If someone dies as a result of the
   actions of a person who was unconscious due to voluntary intoxication, then the killing is
   involuntary manslaughter.

   Involuntary manslaughter has been proved if you find, beyond a reasonable doubt that,
   one, the defendant killed without legal justification or excuse. Two, the defendant did
   not act with the intent to kill. Three, the defendant did not act with a conscious disregard
   for human life. And four, as a result of voluntary intoxication, the defendant was not
   conscious of his actions or the nature of those actions.

   The People have the burden of proving beyond a reasonable doubt that the defendant was
   not unconscious. If the People have not met this burden, you must find the defendant not
   guilty of murder or voluntary manslaughter.

(Id. at 1997-98.)

Petitioner argues that the original instruction of CALCRIM No. 3425 was correct while the modified version was an incorrect statement of the law and undermined his defense of unconsciousness due to voluntary intoxication. (Pet., Attachment A at 3-4.) However, Petitioner's defense was not undermined as the trial court clarified the instructions to comply with the law and the court also instructed on the effects of voluntary intoxication in a homicide.

Under California law, unconsciousness is a complete defense to a criminal charge. Cal. Penal Code section 26; People v. Rogers, 39 Cal. 4th 826, 887 (2006). However, unconsciousness caused by voluntary intoxication is not a complete defense and can only negate specific intent. Cal. Penal Code section 22; People v. Abilez, 41 Cal. 4th 472, 516 (2007). The original instruction suggested that unconsciousness caused by an alcoholic blackout or voluntary intoxication, could result in a complete defense. Therefore, the new revised instruction merely clarified the original instruction in order to highlight the distinction between unconsciousness caused by voluntary intoxication and all other causes of unconsciousness. The recitation of CALCRIM No. 626 with CALCRIM No. 3425 highlighted to the jury that unconsciousness caused by voluntary intoxication was a mitigating element making Petitioner guilty of involuntary manslaughter, and not murder or attempted murder. Further, the other jury instructions, CALCRIM Nos. 625, 2426, 3428, also provided the jury guidance regarding the relevance of unconsciousness to the charged offenses and the distinction between unconsciousness caused by voluntary intoxication and other causes of unconsciousness. Looking at the instructions as a whole, the Court concludes that the revised instruction did not render the trial so fundamentally unfair as to violate federal due process. See Cupp, 414 U.S. at 147. Accordingly, the Court RECOMMENDS that the claim for jury instruction error be DENIED.

## Conclusion

Based on the foregoing, the undersigned Magistrate Judge recommends that the petition for writ of habeas corpus be **DENIED** and **DISMISSED**. This report and recommendation is submitted by the undersigned Magistrate Judge to the United States District Judge assigned to this case, pursuant to the provisions of Title 28, United States Code, section 636(b)(1).

**IT IS ORDERED** that no later than **January 11, 2011**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **January 25, 2011**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

DATED: December 7, 2010

_____
Hon. Anthony J. Battaglia
U.S. Magistrate Judge
United States District Court